UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DR. JOSEPH BATTISTA,

      Plaintiff,

vs.

                                Civil Case No. 2:25-cv-00091-WED

ASCENSION MEDICAL GROUP –
SOUTHEAST WISCONSIN, INC.,

      Defendant.

## DEFENDANT'S STATEMENT OF PROPOSED UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT[1]

Defendant, Ascension Medical Group – Southeast Wisconsin, Inc. ("AMG"), by and through its attorneys, Littler Mendelson, P.C., pursuant to Fed. R. Civ. P. 56 and Civil L. R. 56(b)(1)(C), hereby submits the following Statement of Proposed Undisputed Facts in Support of its Motion for Summary Judgment.

## I.      AMG and St. Joseph's Hospital.

1.      St. Joseph's Hospital ("St. Joe's") is a hospital in Milwaukee in the Ascension health care system. (Declaration of Casey M. Kaiser ("Kaiser Decl.") Ex. P, Transcription of Day 2 of Wisconsin Department of Workforce Development – Equal Rights Division Hearing ("Day 2 Hearing Transcript") at 5:12-14.)

2.      AMG employs medical providers at St. Joe's. (Day 2 Hearing Transcript at 44:9-25.)

3.      St. Joe's is part of AMG's South region. (Day 2 Hearing Transcript at 46:1-3.)

4.      Paul Mason was the Chief Operating Officer of AMG and had responsibility for the company's financial performance. (Day 2 Hearing Transcript at 43:13-44:19.)

---

[1] AMG does not dispute these facts solely for purpose of summary judgment, but reserves the right to dispute any such facts at any trial in this matter as evidence and testimony may warrant.

## II. Surgeon Productivity Metrics.

5. Surgeons at AMG are usually paid a guaranteed salary for the first few years of their practice and then move to a compensation plan based on productivity. (Day 2 Hearing Transcript at 86:5-11.)

6. AMG measures surgeons' productivity by work relative value units ("wRVUs"), *i.e.*, values assigned to billed services. (Kaiser Decl. Ex. O, Transcription of Day 1 of Equal Rights Division Hearing ("Day 1 Hearing Transcript") at 26:15-27:6; Kaiser Decl., Ex. Q, Transcript of Deposition of Patricia Golden ("Golden Dep.")[2] at 21:13-24.)

7. wRVUs are a common metric used industry-wide to assess and compare a surgeon's productivity against other surgeons in a particular medical group and nationwide. (Day 2 Hearing Transcript at 48:22-49:12.)

8. As a general proposition, the more surgeries a surgeon performs, the higher their wRVUs will be and the more revenue they will generate for AMG. (Day 1 Hearing Transcript at 177:10-15.)

9. AMG regularly shares information with surgeons regarding their wRVUS and how their wRVUs compare to those of other surgeons. (Day 1 Hearing Transcript at 27:7-12, 91:21-93:21, 130:1-10.)

10. Not all work a surgeon performs for AMG is credited in wRVUs. For example, Dr. Battista entered an agreement in 2018 to provide certain services at Ascension St. Clare's Hospital and it provided that Dr. Battista would receive a flat fee per shift and not be eligible to earn wRVU credits for his services. (Declaration of Stephanie Flynn ("Flynn Decl."), Ex. A at § 3.2.)

11. Non-clinical work does not generate wRVUs. (Golden Dep. 22:4-10, 42:6-13.)

---

[2] Dr. Golden was Vice President, Clinical, for AMG's North region until November 2022. (Day 1 Hearing Transcript at 38:13-15, 90:19-24.)

### III. Dr. Battista's Employment as a General Surgeon at St. Joesph's Hospital.

12. On or about April 9, 2009, Dr. Battista entered an Employment Agreement with AMG's predecessor, Wheaton Franciscan Medical Group, for an initial term of ten years, and renewable on an annual basis thereafter. (Day 1 Hearing Transcript at 106:5-7, 144:19-24; Flynn Decl. Ex. B, Schedule 3.1, § 1.2.)

13. Dr. Battista's Employment Agreement provided that his productivity for compensation for "professional services" would be calculated based on wRVUs. (Flynn Decl. Ex. B, § 1.1.)

14. The Employment Agreement guaranteed Dr. Battista a minimum salary of $500,000 annually during the first five years of the initial 10-year term. (Flynn Decl. Ex. B, § 2.1.)

15. Separately, Dr. Battista would be compensated for "outside services" based on AMG's policies for such compensation. (Flynn Decl. Ex. B, § 1.2.)

16. The Employment Agreement provided that during years 6-10 of the initial term, there would be no minimum salary and Dr. Battista would be paid for services covered by the agreement based only on his wRVUs. (Flynn Decl. Ex. B, § 2.2.)

17. The Employment Agreement provided that during renewal terms (*i.e.*, after the first 10-year term ended in 2019), Dr. Battista's annual compensation would be calculated according to AMG's standard Physician Compensation Plan and related policies. (Flynn Decl. Ex. B, § 3.)

### IV. Dr. Battista's Inequitable "Call" Sharing and Shrinking Productivity.

18. To ensure that a surgeon is always available when needed, surgeons share "call" in the Emergency Department—*i.e.*, coverage for surgical consultations when no surgeon is otherwise present in the hospital. (Declaration of Anthony Nelson, M.D. ("Nelson Decl.") ¶ 4.)

19. There needs to be a general surgeon on call in the Emergency Department every day. (Nelson Decl. ¶ 4.)

20. Per the contract that Dr. Battista negotiated in 2009, he was required to work call in the Emergency Department "approximately 2-3 times per month." (Flynn Decl. Ex. B, Schedule 3.1, § 4.)

21. Dr. Anthony Nelson was hired in 2012, when there were approximately eleven general surgeons at St. Joe's, and his contract required him to work call a minimum of four times per month. (Day 2 Hearing Transcript at 4:20-6:5, 10:5-23.)

22. By 2019, the number of general surgeons at St. Joe's declined to three: Dr. Battista and his partners, Dr. Nelson and Dr. Ryan Berg. (Day 2 Hearing Transcript at 6:11-23; Day 1 Hearing Transcript at 108:20-24.)

23. Dr. Battista did not split the call schedule evenly with Dr. Nelson and Dr. Berg. He was on call an average of three days per month, and Dr. Nelson and Dr. Berg split the remainder of the days (*i.e.*, 27+ days) each month. (Day 1 Hearing Transcript at 185:21-186:21; Day 2 Hearing Transcript at 7:2-15, 11:16-14:15.)

24. Working more call normally translates into increased wRVUS because being on call results in opportunities to perform services (including surgeries) that generate wRVUs. (Day 2 Hearing Transcript at 10:25-11:15; 50:6-20; Day 1 Hearing Transcript at 27:13-23; Kaiser Decl. Ex. R, Transcript of Deposition of Andrew Goelz ("Goelz Dep.") 46:12-3-21.)

25. Dr. Battista understood that working less call than Dr. Nelson and Dr. Berg meant their productivity would outpace his. (Day 1 Hearing Transcript at 186:18-21.)

26. By mid-2021, Dr. Battista's annual salary on AMG's productivity-based Physician Compensation Plan was down to $304,000. (Flynn Decl. Ex. C.)

27. Effective September 2021, Dr. Battista's wRVU productivity was so low that AMG reduced his annual salary to $260,000 under the standard Physician Compensation Plan. (Flynn Decl. Ex. C; Day 1 Hearing Transcript at 179:22-24.)

28. Dr. Battista was aware that his low wRVU productivity was the reason his pay was reduced, and he acknowledges that he was paid appropriately in relation to his productivity. (Day 1 Hearing Transcript at 180:20-181:3.)

29. Per the standard Physician Compensation Plan, if a physician was tracking behind target in wRVU production by 20% or more as of June 30, 2022, their compensation would be decreased as of August 1, 2022 and, while the Compensation Plan had a "limiter" on how much compensation could be decreased, it applied only to providers whose wRVUs were at or over the 25th percentile nationally. (Flynn Decl. Ex. D.)

30. Dr. Battista's wRVUs were below the 10th percentile nationally, meaning "90% of the surgeons across the country [were] producing more wRVUs." (Day 2 Hearing Transcript at 57:20-59:14, 62:10-63:3; Declaration of Pete Leonard ("Leonard Decl.") Ex. E; Day 1 Hearing Transcript at 74:8-75:2; Leonard Decl. Ex. M.)

31. RVUs at such a low level are generally only seen when a surgeon is starting to build a new practice, *i.e.*, "ramping up," or when they are phasing out of practice, *i.e.*, "ramping down." (Day 1 Hearing Transcript at 73:14-25; Day 2 Hearing Transcript at 63:4-16.)

**V. Dr. Battista's Involvement in Recruiting Dr. Andrew Goelz.**

32. Around 2019 or 2020, Drs. Battista, Nelson, and Berg began discussing hiring another general surgeon at St. Joe's. (Day 1 Hearing Transcript at 27:24-29:20, 111:13-17; Day 2 Hearing Transcript at 15:23-18:7.)

33. Dr. Nelson testified that he believed he, Dr. Battista, and Dr. Berg were engaged in succession planning when they discussed hiring a new partner. (Day 2 Hearing Transcript at 15:23-18:7.)

34. Although Dr. Battista had not announced a retirement date, Dr. Nelson recalls him saying that he was not in the group's "five-year plan" and that Dr. Nelson and Dr. Berg should

have the final say as to who would join their practice. (Day 2 Hearing Transcript at 15:23-16:13, 38:18-39:2.)

35. Dr. Battista understood that the new surgeon would eventually replace him when he retired. (Day 1 Hearing Transcript at 191:23-192:7.)

36. Dr. Battista was supportive of this plan and never objected to it. (Day 1 Hearing Transcript at 192:17-19; Day 2 Hearing Transcript at 52:25-53:2.)

37. Eventually, the group decided to make an offer to Dr. Andrew Goelz, who had been a resident at St. Joe's and would be completing residency in the summer of 2022. (Day 1 Transcript at 20:19-21:22; Day 2 Transcript at 53:3-5.)

38. Dr. Battista testified that it was a "group decision" to add Dr. Goelz to their practice. (Day 1 Hearing Transcript at 111:18-20, 191:18-22.)

39. Dr. Goelz accepted the offer and was scheduled to start his employment on July 25, 2022. (Day 1 Hearing Transcript at 10:15-16; Day 2 Hearing Transcript at 14:20-24.)

40. Dr. Goelz testified that he had the impression from Drs. Battista, Nelson, and Berg that Dr. Battista was planning to retire and that he would replace Dr. Battista. (Day 1 Hearing Transcript at 16:1-17:18; Goelz Dep. at 34:12-36:3.)

## VI.    AMG is Led to Believe that Dr. Battista Would Soon Wind Down His Practice.

41. In September 2021, Dr. Nelson asked Dr. Battista about his plans for the call schedule in 2022. (Nelson Decl. Ex. F.)

42. Dr. Battista, with the knowledge that Dr. Goelz would be joining in mid-year 2022, told Dr. Nelson that for the first half of 2022, he would continue working one weekend of call per month (as he had been), and that "[o]nce [Dr. Goelz] joins the group and I am no longer taking regular call with the group I will turn everything over to you. Also I may start to take a week or two off every month starting in January [2022] to spend more time in Florida especially if my

income continues to drop." (Nelson Decl. F; Day 1 Hearing Transcript at 131:16-21, 194:25-195:9.)

43.     Dr. Battista's reference to his income continuing to drop related to AMG reducing his compensation due to his low wRVU productivity. (Day 1 Hearing Transcript at 197:21-24.)

44.     In December 2021 and January 2022, Dr. Nelson exchanged emails with Dr. Pasquale Bernardi (Clinical Vice President) to ask about a change to the group's call agreement at St. Joe's and explained that he was asking because "[w]hile not imminent, in particular we are hoping to be prepared to seamlessly transition our call schedule once our senior partner Dr. Battista ultimately retires in the near future." (Nelson Decl. Ex. G at 0000500; Day 1 Hearing Transcript at 75:19-20.)

45.     Dr. Nelson also told Dr. Bernardi that Dr. Battista would no longer take call after Dr. Goelz started work. (Nelson Decl. Ex. G at 0000499.)

46.     A few days later, Dr. Battista emailed the technical director for the vascular lab where Dr. Battista had been serving as the physician director to inform her that he would like to step down and that Dr. Nelson would be stepping in as his replacement as the new physician leader. Dr. Battista reported that he and Dr. Nelson were "planning for the future." (Nelson Decl. Ex. H at 0000013.)

47.     Mr. Mason also recalled that Dr. Battista's expected retirement was discussed at AMG's meetings with the general surgeons. (Day 2 Hearing Transcript at 51:922.)

**VII.    AMG's Economic Recovery Mode and the Decision to Terminate Dr. Battista's Employment.**

48.     In the wake of the COVID-19 pandemic, patient volume was down across all of AMG's facilities, creating a financial impact on the organization. (Day 1 Hearing Transcript at 96:4-29; Day 2 Hearing Transcript at 55:14-23.)

49. Given the reduced volume, AMG began working on an economic recovery plan by evaluating projected patient activity and how many physicians AMG would need going forward across the entire organization. (Day 1 Hearing Transcript at 96:20-97:6; Day 2 Hearing Transcript at 55:23-56:22; Golden Dep. at 13:4-11.)

50. An evaluation of expected patient volume and physician productivity took place in late Spring 2022 among a group of financial and operational executives in consultation with physicians. (Day 2 Hearing Transcript at 56:5-57:11; Golden Dep. 13:20-14:2.)

51. AMG also reviewed the productivity of physicians in all specialties across the organization, including general surgeons. (Day 2 Hearing Transcript at 57:14-58:25.)

52. As part of this exercise, AMG's Chief Financial Officer, Tim Masek, calculated surgeons' annualized wRVUs by using March to May of 2022 as the base period, and he compared each surgeon's annualized wRVUs to the national median. (Day 1 Hearing Transcript at 66:14-69:1; Day 2 Hearing Transcript at 59:1-60:18.)

53. AMG selected March to May 2022 as the base period for annualizing wRVUs because it was generally busy and did not include holidays that would impact productivity. (Day 2 Hearing Transcript at 60:15-61:14.)

54. In May 2022, AMG assessed each South region hospital and clinician on an individual basis, including St. Joe's, All Saints Hospital - Racine, Elmbrook, St. Francis, and Franklin. (Golden Dep. 14:19-15:12, 17:11-19, 20:19-23; Kaiser Decl. Ex. I.)

55. AMG assessed each facility's unique situation and needs, whether each facility could sustain the number of general surgeons currently on staff, each surgeon's wRVUs, whether any surgeons planned to retire, and what options existed for staffing changes to reduce costs. (Day 1 Hearing Transcript at 96:4-97:6; Golden Dep, 16:16-23; Kaiser Decl. Ex. I.)

### A. Considerations and Recommendations Relating to Hospitals Other than St. Joe's.

56. At St. Francis/Franklin, AMG decided to terminate the employment of Dr. Edwards because he had the lowest annualized wRVUs (3,724) of all general surgeons at those facilities and second lowest in the region. (Day 1 Hearing Transcript at 97:14-20, 98:11-12; Day 2 Hearing Transcript at 66:5-67:2; Kaiser Decl. Ex. I at 0000061, 64; Leonard Decl. Ex. E.)

57. Elmbrook has a busy bariatric practice and the highest level of trauma patients in the South region and was seeing increased volume.[3] (Day 2 Hearing Transcript at 67:11-68:13; Golden Dep. 28:21-29:16; Kaiser Decl. Ex. I at 0000060, 63.)

58. Dr. Wu had the lowest wRVUs at Elmbrook but his bariatric practice was still needed, so AMG reduced his practice to a few days per week. (Day 2 Hearing Transcript at 68:5-13; Golden Dep. 54:2-15; Leonard Decl. Ex. E.)

59. Elmbrook also had the most surgeons of any facility in the South region, and by reducing Dr. Wu to part-time status and slightly reducing the full-time status of three other surgeons, AMG was able to achieve a total reduction equivalent to one full-time employee ("FTE") without a termination. (Leonard Decl. Ex. E.)

60. The initial recommendation for All Saints Hospital in Racine in May 2022 was to terminate one general surgeon, but because a surgeon voluntarily resigned, AMG did not need to terminate anyone there. (Leonard Decl. Ex. E; Leonard Decl. Ex. J; Kaiser Decl. Ex. I at 0000064.)

### B. Considerations and Recommendations for St. Joe's.

61. Based on patient volume forecasting and surgeon productivity, AMG determined that St. Joe's needed three general surgeons, not four. (Golden Dep. 19:3-17.)

---

[3] St. Joe's, in contrast, has more of a general surgery practice. (Day 2 Hearing Transcript at 48:10-17.)

62. AMG would not have authorized hiring Dr. Goelz if it had not believed that Dr. Battista was planning to retire soon after because the amount of patient volume and surgical work at St. Joe's did not justify employing a fourth surgeon. (Day 2 Hearing Transcript at 53:8-20.)

63. When AMG was assessing staffing needs in 2022, Dr. Goelz had already signed his contract and had a July 25, 2022 start date. (Day 1 Hearing Transcript at 10:15-17; Day 2 Hearing Transcript at 88:24-89:8.)

64. Had AMG cancelled Dr. Goelz's contract, it would have had to pay him during a 90-day notice period. (Flynn Decl. ¶ 8.)

65. AMG assessed all general surgeons at St. Joe's, including Dr. Goelz, based on its expectations of the wRVUs he would generate after he began seeing patients. (Kaiser Decl. Ex. I at 0000062; Leonard Decl. Ex. E.)

66. Dr. Battista had the lowest wRVUs (3,104) of all general surgeons at St. Joe's (except for Dr. Goelz, who had not yet started his employment). (Leonard Decl. Ex. E; Day 2 Hearing Transcript at 65:13-16.)

67. Dr. Battista's wRVUs were also the lowest of any surgeon in the South region and below the 10th percentile nationally. (Day 2 Hearing Transcript at 62:10-63:3; Leonard Decl. Ex. E.)

68. In contrast, Dr. Nelson's wRVUs (10,948) and Dr. Berg's wRVUs (7,804) were among the highest in the South region and above the national median. (Leonard Decl. Ex. E.)

69. AMG projected that Dr. Goelz's wRVUs in his first year of employment (*i.e.*, while "ramping up") would be slightly above Dr. Battista's annualized wRVUs. (Leonard Decl. Ex. E.)

70. AMG also considered Dr. Battista's inequitable call in comparison to his partners, Dr. Nelson and Dr. Berg, and as compared to other general surgeons employed by AMG who

shared call equally. (Day 1 Hearing Transcript at 94:8-16; Kaiser Decl. Ex. I at 0000062; Golden Dep. 26:12-17.)

71. Working call helps a surgeon grow their practice. (Day 1 Hearing Transcript at 95:3-18; Day 2 Hearing Transcript at 49:24-50:1; Golden Dep. 27:6-8.)

72. Dr. Battista admitted that he did not want to grow his practice. (Day 1 Hearing Transcript at 201:20-21.)

73. Dr. Battista never indicated to AMG leadership that he wanted to increase his call. (Day 1 Hearing Transcript at 187:14-19.)

74. In contrast, AMG knew that Dr. Goelz planned to share call equally with Dr. Nelson and Dr. Berg after he started working call in September 2022. (Nelson Decl. Ex. G at 0000499; Goelz Dep. 5:9-11.)

75. Two options AMG considered with respect to Dr. Battista were discussing early retirement with him or terminating his employment. (Kaiser Decl. Ex. I at 000062, 64.)

76. AMG also factored in the possibility Dr. Battista might voluntarily resign because his compensation was about to be reduced significantly again based on his low productivity. (Kaiser Decl. Ex. I at 0000062, 64; Day 2 Hearing Transcript at 79:5-18; Day 1 Hearing Transcript at 78:5-19, 85:22-86:5.)

**C. General Surgeon Terminations.**

77. In July 2022, AMG approved a recovery plan for general surgery in the South region that included terminating Dr. Edwards' employment and discussing retirement options with Dr. Battista. (Leonard Decl. Ex. K at 0000353; Leonard Decl. Ex. E.)

78. On August 1, 2022, AMG notified Dr. Edwards of his termination, effective November 4, 2022. (Declaration of Adriane Story ("Story Decl.") Ex. L.)

79. Dr. Edwards was 48 years old at the time of his termination, and was younger than many general surgeons who were not selected for termination, the oldest of whom was 75years old. (Day 1 Hearing Transcript at 97:21-98:7; Story Decl. ¶ 5.)

80. On August 1, 2022, AMG approached Dr. Battista to determine what his plans for retirement were. (Day 1 Hearing Transcript at 120:13-24, 122:2-16.)

81. AMG expects that once a new physician is hired as part of succession planning, there will be a handoff period of a few months before the outgoing physician retires, meaning AMG expected Dr. Battista would retire within a few months after Dr. Goelz started work. (Day 2 Hearing Transcript at 54:15-55:2, 89:16-18.)

82. AMG had expected Dr. Battista to submit paperwork indicating a retirement date, but he had not submitted it. (Day 2 Hearing Transcript at 77:9-78:4.)

83. Battista responded to AMG's August 1, 2022 inquiry by stating that he planned to mentor Dr. Goelz and had "absolutely no plans" for retirement. (Day 1 Hearing Transcript at 122:2-17.)

84. Upon learning on August 1, 2022 that Dr. Battista did not plan to retire, AMG notified him that his employment would be terminated and that his actual termination date would be communicated in the future. (Day 1 Hearing Transcript at 120:24-121:2, 122:16-20, 207:19-21.)

85. Dr. Battista received his termination letter (dated December 1, 2022) on December 9, 2022. (Day 1 Hearing Transcript at 126:9-11; Kaiser, Decl. Ex. N, Claimant's Hearing Ex. C4.)

86. Per Dr. Battista's Employment Agreement, AMG was required to provide him with 120 days' notice of termination. (Day 1 Hearing Transcript at 126:12-127:4; Flynn Decl. Ex. B, § 5.1(a).)

87.     As a result, Dr. Battista's employment continued until April 8, 2023. (Day 1 Hearing Transcript at 130:13-16.)

Dated:  January 12, 2026                    Respectfully submitted,

                                            *s/ Casey M. Kaiser*
                                            Sofija Anderson, Bar No. 1041498
                                            svanderson@littler.com
                                            Casey M Kaiser, Bar No. 1088881
                                            ckaiser@littler.com
                                            LITTLER MENDELSON, P.C.
                                            111 East Kilbourn Avenue, Suite 1000
                                            Milwaukee, Wisconsin 53202
                                            Telephone:     414.291.5536
                                            Facsimile:     414.291.5526

                                            Attorneys for Defendant