UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DR. JOSEPH BATTISTA,

Plaintiff,

v.                                         Civil Case No. 2:25-cv-00091-WED

ASCENSION MEDICAL GROUP –
 SOUTHEAST WISCONSIN, INC.,

Defendant.

## PLAINTIFF'S PROPOSED FACTS

Plaintiff Dr. Jospeh Battista, through his undersigned attorneys, submits pursuant to Fed. R. Civ. P. 56 and Civil L. R. 56(b)(1)(C) the following proposed facts.

1.      Battista was born December 31, 1953. 103:8[1].

2.      Battista has been a surgeon since 1983. 104:12; C1.

3.      Battista was in private surgical practice for 21 years and performed surgeries at St. Joseph's hospital since July 1, 1988. 106:5.

4.      Battista joined Wheaton Franciscan, Ascension's predecessor, in 2009. 106:7.

5.      Battista has always been board certified and received many awards as a surgeon. 107:6-25; 108:1-5; C1.

6.      Battista has never been sued for malpractice and his medical license has never been restricted. 108:7-12. Battista never received a patient complaint and Ascension never paid any of Battista's patients to resolve an allegation of malpractice. 108:13-17.

---

[1] Citations to the hearing transcript are from Day 1 (Dkt. 26-3), unless prefixed "Day 2" (Dkt. 26-4).

7. Administration was aware of Battista's reputation as an excellent surgeon. 12:9-25; 13:1-12; 39:9-11.

**Goelz was much younger and less qualified than Battista.**

8. In 2020, Drs. Battista, Berg and Nelson started to discuss adding a surgeon to their group and they decided on Goelz. 111:13-17.

9. Goelz was born September 11, 1990. 10:13-14.

10. When Goelz started employment at Ascension, he understood that he would be replacing Battista. 20:1-4.

11. Goelz, Battista, Nelson, and Berg are all general surgeons. 20:15-18.

12. Goelz started employment with Ascension on July 25, 2022, and started performing surgery a month later. 13:13-18.

13. It was Goelz's first position out of residency. 10:18-20.

14. Goelz passed his final boards in October or November 2022. 14:7-8.

15. As of August 2022, through the present time, Goelz has had difficulty getting patient referrals. 14:15-17.

16. Goelz's RVU goal was set at virtually the same level as Battista's RVU goal for 2022 Q1. 73:14-15; R5.

17. Goelz failed to meet his target RVUs. 33:7-8.

18. Goelz was paid a guaranteed salary of $400,000. 138:11-12.

19. Ascension paid Battista based on his production—not a set salary. 78:5-24; Ex. R4.

20. Battista's qualifications far exceeded those of Goelz. 51:7-13.

21. Goelz was hired to replace Battista. 75:12-16.

22. Goelz took over Battista's work. 74:1-4.

23. Goelz initially performed only relatively simple surgeries, such as hernias, gall bladders, lumps and bumps. 154:1-15; 155:1-7.

24. Battista performs major vascular, pancreatic, liver, and adrenal surgeries, which Goelz, Nelson and Berg do not. 154:6-8. Battista also performs all of the general surgeries performed by Goelz. 155:3-7.

**Battista's role had always included helping the younger surgeons.**

25. Battista helped each new surgeon in the OR and also gave them his clinical hours to help them establish their own practices, with no benefit to himself. 113:15-25; 114:1-25; 115:1-3; 207:1-9.

26. Battista did the same for Goelz not realizing Battista would be punished for it. 205:17-23.

27. Berg and Nelson refused to give up any patients or clinical hours to help Goelz start his practice. 206:17-25; R9.

28. By giving some office hours to Goelz, Battista was not reducing his volume of patients—it was Ascension that unilaterally took away a full clinical day of his patients. 207:14-18; 216:18-25; 217:1-3.

29. Battista was to be Goelz's mentor for 6-12 months. 11:2-4.

30. Battista had also trained Goelz's two senior partners. 113:2-10.

31. Berg and Nelson spoke highly of the training they received from Battista. 11:14-16.

32.     Goelz could call on Battista when he needed guidance on a complicated surgery. 11:17-23. If Goelz got into trouble during a case and was panicking he would call on Battista. 11:24-25; 12:1-8.

33.     Battista was a beloved highly respected surgeon, a pillar, and a legend in the surgical community. 12:9-25; 13:1-12.

**Nelson took Battista off the ER call schedule.**

34.     Battista always exceeded the call requirement of his contract. 132:5-9.

35.     When Goelz started, Nelson took Battista off the emergency call schedule, with the understanding that Battista's main role would be as mentor to Goelz. 112:15-20.

36.     Battista had taken calls since 1988. 131:11-13.

37.     Battista asked Nelson if he could take call one weekend per month to be fair and equitable. 133:15-25; 134:1-10.

38.     Nelson told Battista that he had the authority to make the schedule as the Chief of Surgery and that Battista should not worry about taking call because he had earned it with his age and seniority. 131:16-25; 132:1-25.

39.     In making the termination decision, Mason was not aware that Nelson had taken Battista off the ER call schedule. Day 2[2], 71:20-22; 72:4-9.

40.     Battista never had control of this call schedule. Day 2, 74:4-9.

41.     Mason was not aware that Battista was part of the call schedule all the way up to the day Goelz began working for Ascension. Day 2, 71:10-14.

42.     Battista was never asked to take more call. 186:17.

---

[2] Day 2 Transcript is found at Dkt. 26-4.

43. Nelson claimed Battista refused to take more call but could not remember when this occurred, or any other details. Day 2, 34:14-25; 35:1-25.

44. Mason did not warn Battista he would be terminated if he did not increase his calls. Day 2, 83:23-25.

45. The younger surgeons were incentivized to take call because the more a surgeon takes call schedules, the more they are paid on an escalating scale. Day 2, 36:7-8.

46. Nelson makes $1,000 per call. Day 2, 36:9-11.

**When Battista refused to retire, Ascension terminated him.**

47. On August 1, 2022, Hayssen and Haigh came to Battista's office unannounced, asked Battista what plans he had for retirement, and when Battista said he was not planning to retire, they told him he was being terminated. 120:18-25; 121:1-14.

48. Battista has no plans to retire and is still a practicing surgeon with a growing private practice. 210:6-15.

**Call hours and RVUs were never discussed with Battista.**

49. In the termination meeting, no mention was made of Battista's productivity or his call hours. 128:23-25; 129:1-25.

50. At no time did anyone question Battista's call hours. 128:23-25; 129:1-25.

51. No monthly meetings were held by administration with Battista. 128:23-25; 129:1-25.

52. Mason does not recall what, when, or how, he discussed RVUs with Battista. Day 2, 73:9-12.

53. Mason did not tell Battista he would be fired if he did not increase his RVUs. Day 2, 83:18-22.

54. Battista asked why he was being terminated and was told "it has been decided." 125:14-22.

55. Battista was not given the option to reduce his full-time status like the other surgeons. 70:2-4; 71:3-5; 126:6-8.

56. Battista's termination letter said nothing about RVUs. C4.

57. Battista was never told orally or in writing that he was expected to increase his RVU numbers. 142:22-24.

58. Battista was never told that he would be evaluated based on his RVU numbers. 142:25; 143:1.

59. Battista had never been disciplined by Ascension. 155:8-10.

60. Nelson and Berg knew about the termination weeks before Battista was told. Day 2, 18:20-25; 19:1-11.

61. Nelson and Berg immediately stopped communicating with Battista and avoided him by ducking when they saw him. 117:5-12.

62. In November 2022, Battista emailed Nelson and Berg asking to talk in person about how they were avoiding him. 119:7-25; 120:1-11; C3.

**Battista never told anyone he was going to retire.**

63. Battista never told anyone he was going to retire by a specific or date or general timeframe. 14:24-25; 15:1; 17:20-22; 18:5-15; 75:21-25; 76:1-2; 78:1-9; Day 2, 77:24-25; 78:1-9.

**Ascension failed to credit Battista for his work at Ascension facilities outside of St. Joseph's.**

64. When a surgeon works at a different facility, the expectations of RVU productivity at their home facility are reduced. 51:22-25; 52:1-16.

65. In the process of terminating Battista's employment, Ascension did not offset his RVUs for his work at Weston or the Wisconsin Health Fund. 145:14-25; 151:3-25; 152:1-5.

66. Battista was asked by President Standridge and Sr. VP Sherry to work at Ascension's Weston facility to rebuild its surgical practice one to two weeks per month. 146:7-23.

67. Due to Battista's work, surgeons returned to the Weston facility and others were recruited. 147:1-25; 148:1-4.

68. Battista's departure to Weston hurt his practice in Milwaukee. 148:18-25.

69. While Battista was in Weston, Berg got Battista's work and reduced Battista's production at St. Joesph's by 25%. 149:1-9.

70. Before going to Weston, Battista maintained RVUs of 4,000 to 6,000 annually. 149:10-13.

71. The reduction of productivity at St. Josephs due to working at Weston had a lasting negative effect because doctors get into referral routines. 149:19-25; 150:1-12.

72. Notwithstanding the setback of helping Ascension in Weston, Battista's productivity was increasing during the three months prior to his termination and was higher than the surgeons who were retained by Ascension. 150:15-25; 151:1-2.

73. Ascension did not credit Battista for his work at the Teamsters (Wisconsin Health) clinic. 214:22-25; 215:1-11.

74. Battista helped Ascension in this regard by bringing other physicians into the Wisconsin Health clinic. 151:3-25.

75. The Wisconsin Health clinic is a feeder to Ascension for cancer care, orthopedics, and surgery. 153:4-19.

76. Ascension collected the money for all of the work Battista did at Wisconsin Health. 214:22-25; 215:1-11.

**Battista was not given the option to reduce his full-time status like the surgeons who were retained.**

77. Hearing Exhibit R5 was a spreadsheet used during meetings discussing termination of Battista, created in late spring 2022. 66:19-22.

78. Hearing Exhibit R4 was created by Bernardi and discussed with Mason. Day 2, 74:15-22.

79. Ascension considered an accelerated retirement offer for Battista to quit, and considered cutting his pay to prompt his resignation. Day 2, 77:1-25.

80. Ascension did not terminate any of the seven surgeons at Elmbrook who all perform general surgery. 65:2-17; Day 2, 68:1-13.

81. Dr. Wu was one of those surgeons who had RVUs similar to Battista. 65:13-15.

82. Dr. Wu was not terminated because Mason determined that he had a skillset that served that patient community, but Mason did not do the same analysis for Battista. Day 2, 88:4-17.

**Battista has not retired.**

83. Battista immediately took steps to start his own surgical practice and maintain his medical director role when terminated from Ascension. 155:11-25; 156:1-15.

84. Battista is a surgeon for Solstice Health and Concentra. 155:11-25; 156:1-15.

85. At no time did Battista retire. 155:11-25; 156:1-15.

Respectfully submitted this 11th day of February, 2026.

<u>*Electronically signed by Alan C. Olson*</u><br>
Alan C. Olson, SBN: 1008953<br>
Attorneys for Plaintiff<br>
Alan C. Olson & Associates, S.C.<br>
2880 S. Moorland Rd.<br>
New Berlin, WI 53151<br>
(262) 785-9606<br>
AOlson@Employee-Advocates.com