# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOSEPH BATTISTA,

        **Plaintiff,**

        **v.**                         **Case No. 25-CV-91**

ASCENSION MEDICAL GROUP—
SOUTHEAST WISCONSIN, INC.,

        **Defendant.**

# ORDER

## 1. Procedural History

Plaintiff Dr. Joseph Battista brings a claim for unlawful age discrimination under the Age Discrimination in Employment Act of 1967. (ECF No. 2.) Defendant Ascension Medical Group – Southeast Wisconsin, Inc. (hereinafter "Ascension") filed a motion for summary judgment. (ECF No. 23.) All parties have consented to the full jurisdiction of this court pursuant to 28 U.S.C. § 636(c). (ECF Nos. 9, 10) The court has jurisdiction under 28 U.S.C. § 1331. Ascension's motion for summary judgment has been fully briefed and is ready for resolution.

## 2. Preliminary Matters

Ascension submitted Proposed Findings of Fact in support of its motion for summary judgment. (ECF No. 25.) Dr. Battista responded (ECF No. 32) and submitted his own Proposed Findings of Fact (ECF No. 31). Many of Dr. Battista's responses to Ascension's Proposed Findings of Fact simply state that a fact is "disputed," yet often fail to identify a genuine dispute. Frequently, the purported disputes are legal arguments, not factual disagreements, or are unrelated to the proposed fact.[1] In some of the responses Dr. Battista attempts to dispute his own testimony and contemporaneous writings with assertions that do not actually refute the testimony or writings.[2] He also attempts to "dispute" facts about how Ascension measured its surgeons' productivity by arguing that Ascension should have used a different time period in its analysis.[3] He further "disputes" other proposed facts on the ground that they are "immaterial."[4]

"[I]f a material fact is not disputed (or if there is no evidence that controverts the fact), the district court is entitled to know that up front, without first having to examine citations to evidence having only marginal bearing on the question." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). Dr. Battista often "fails to properly address [the defendants'] assertion of fact as required by Rule 56(c)." Fed. R.

---

[1] *See e.g.*, ECF No. 32, ¶¶ 6–10, 18, 26–27, 29–31, 33–34, 50–55, 65–70, 74–77, 81.

[2] *Id.*, ¶¶ 9, 25, 28, 35–36, 42–46, 72–73.

[3] *Id.*, ¶¶ 52–55, 65–67, 69.

[4] *Id.*, ¶¶ 56, 60, 79.

Civ. P. 56(e). In those instances, "the court may…consider the fact undisputed for purposes of the motion." *Id*. To the extent that the court recounts any such "disputed" facts as undisputed, it reflects the court's conclusion that Dr. Battista failed to demonstrate that the proposed finding of fact is "genuinely disputed." *See* Fed. R. Civ. P. 56(c)(1)(B).

**3. Facts**

The following facts are drawn primarily from Ascension's Proposed Findings of Fact (ECF No. 25) and Dr. Battista's Proposed Findings of Fact. (ECF No. 31.) Unless otherwise noted, these facts are considered undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2). The court draws all reasonable inferences in favor of Dr. Battista as the non-moving party.

Ascension is an organization that employs medical providers at hospitals in the southern region of Milwaukee. (ECF No. 25, ¶¶ 1–3, 54.) In 2009 Dr. Joseph Battista was hired by Ascension's predecessor to work as a general surgeon at St. Joseph's Hospital in Milwaukee. (*Id*., ¶ 12.) Dr. Battista's employment agreement stated that, after his initial ten-year term, his annual compensation would be determined according to Ascension's standard Physician Compensation Plan and policies. (*Id*., ¶ 17.) The agreement further

provided that Dr. Battista would work on "call" in the Emergency Department "approximately 2-3 times per month." (*Id.*, ¶ 20.)[5]

Ascension's standard Physician Compensation Plan compensates surgeons based on their productivity. (ECF No. 25, ¶ 5.) Productivity is measured using work relative value units (hereinafter "wRVUs"). (*Id.*, ¶ 6.) wRVUs are a commonly used metric to assess and compare a surgeon's productivity. (*Id.*, ¶ 7.) The more surgeries a surgeon performs, the greater their wRVUs and the more revenue they generate. (*Id.*, ¶ 8.) A surgeon's work for Ascension is either credited in wRVUs or compensated by a stipend, but not both. (*Id.*, ¶ 10; ECF No. 26-5 at 41:1–7.)

In 2020, St. Joseph's Hospital employed three general surgeons: Drs. Battista, Anthony Nelson, and Ryan Berg. (ECF No. 25, ¶ 32; ECF No. 26-3 at 108:22–25.) The group discussed hiring an additional surgeon and ultimately selected Dr. Andrew Goelz. (ECF No. 25, ¶ 37.) Neither party's Proposed Findings of Fact specify when Dr. Goelz was offered or accepted the position. However, he completed his residency at St. Joseph's Hospital in the summer of 2022 and was scheduled to begin work on July 25, 2022. (*Id.*, ¶¶ 37, 39.) Dr. Goelz understood from Drs. Battista, Nelson, and Berg, that Dr. Battista planned to retire and that he was hired as his replacement. (*Id.*, ¶ 40; ECF No. 31, ¶ 10.) At the time Dr. Goelz began his employment, he was 32 years old. (ECF No. 31, ¶ 9.)

---

[5] "Call" refers to a surgeon being available in the Emergency Department to provide surgical consultations when no other surgeon is present at the hospital. (ECF No. 25, ¶ 18.) There must always be at least one surgeon on call in the Emergency Department. (*Id.*, ¶ 19.)

In the late spring of 2022 Ascension began developing an economic recovery plan to address the financial challenges caused by the COVID-19 pandemic. (ECF No. 25, ¶ 49; ECF No. 26-5 at 13:25–14:2.) As part of this plan Ascension's Chief Financial Officer calculated each surgeon's annualized wRVUs using March–May 2022 as the base period. (ECF No. 25, ¶ 52.) Ascension then evaluated each of its hospitals in the southern region of Milwaukee to determine whether they could sustain their current number of surgeons. (*Id.*, ¶ 55.)

Based on projected patient volume and surgeon productivity, Ascension determined that St. Joseph's Hospital needed only three surgeons. (ECF No. 25, ¶ 61.) Since Ascension would have been required to pay Dr. Goelz if his contract was canceled before his start date, they included him in the surgeon analysis at St. Joseph's Hospital. (*Id.*, ¶ 63–65.) Upon comparison, Ascension determined that Dr. Battista had the lowest annualized wRVUs among the three current surgeons at St. Joseph's Hospital, as well as slightly lower wRVUs than Dr. Goelz's projected wRVUs for his first year. (*Id.*, ¶¶ 66, 69.) Ascension also considered that Dr. Battista did not share the call duties equally with the other two surgeons, unlike Dr. Goelz, who intended to do so. (*Id.*, ¶¶ 70–71, 74.)

Ascension considered the possibility that Dr. Battista might be planning to retire soon, as he had participated in recruiting and hiring Dr. Goelz, which Ascension interpreted as a succession plan. (ECF No. 25, ¶ 81.) When Dr. Nelson asked Dr. Battista about his plans for working call in 2022, Dr. Battista responded: "Once [Dr. Goelz] joins

5

the group and I am no longer taking regular call with the group I will turn everything over to you. Also I may start to take a week or two off every month starting in January [2022] to spend more time in Florida especially if my income continues to drop." (*Id.*, ¶ 42; ECF No. 27-1 at 2 (Nelson email).) In January 2022 Dr. Battista also stepped down from his role as physician director because he and Dr. Nelson were "planning for the future." (ECF No. 25, ¶ 46; ECF No. 27-3 at 2 (Nelson email).) However, Dr. Battista never told anyone at Ascension that he was retiring and believed he was going to mentor Dr. Goelz for 6-12 months, just as he had done with Drs. Nelson and Berg. (ECF No. 31, ¶¶ 29, 30.)

On August 1, 2022, Ascension asked Dr. Battista about his retirement plans. (ECF No. 25, ¶ 80.) Dr. Battista stated that he did not plan to retire and intended to mentor Dr. Goelz. (*Id.*, ¶ 83.) Ascension then informed Dr. Battista that his employment would be terminated, with his actual termination date to be communicated later. (*Id.*, ¶ 84.) Under Dr. Battista's employment agreement, Ascension was required to provide him with 120 days' notice before the termination date. (*Id.*, ¶ 86.) Dr. Battista received his termination letter on December 9, 2022, and his last day was April 8, 2023. (*Id.*, ¶¶ 85, 87.) He was 68 years old at the time of his termination. (ECF No. 31, ¶ 1; *see also* ECF No. 34 at 19.)

At Ascension's St. Francis/Franklin Hospital it terminated Dr. Rob Edwards, who had the lowest annualized wRVUs among the surgeons at that hospital. (ECF No. 25, ¶ 56; *see also* ECF No. 26-3 at 97:18.) Dr. Edwards was 48 years old at the time of his termination, younger than other surgeons Ascension retained, including one who was 75.

(ECF No. 25, ¶ 79.) At Elmbrook Hospital, Dr. Bobby Wu had the lowest annualized wRVUs but, because Ascension decided his specialty practice was still needed, they reduced his hours and those of Elmbrook's other surgeons rather than terminating him. (*Id.*, ¶ 59; ECF No. 26-3 at 65:9–17.) Ascension had planned to terminate a surgeon at All Saints Hospital but, because one surgeon resigned voluntarily, termination was not necessary. (ECF No. 25, ¶ 60.)

### 4. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence" in favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

7

"The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## 5. Analysis

### 5.1. The Age Discrimination in Employment Act

Title VII prohibits employers from discriminating against their employees based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). The Age Discrimination in Employment Act ("ADEA") further prohibits employers from discriminating against workers aged 40 or older. 29 U.S.C. § 623(a)(1). To succeed on an age discrimination claim, an employee must show that his age was the "but-for" cause of the adverse employment action. *Tyburski v. City of Chi.*, 964 F.3d 590, 598 (7th Cir. 2020).

"An employee may establish a claim of age discrimination in employment through direct or indirect evidence." *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 714 (7th Cir. 1999). Under the indirect method of proof, a plaintiff must first establish a prima facie case of discrimination. *Id.* at 716 (7th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). To establish a prima facie case of employment discrimination, a plaintiff must show that: "(1) []he is a member of a protected class, (2) []he was meeting the defendant's legitimate expectations, (3) []he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably." *Tyburski*, 964 F.3d at 598. "When an employee's position is

8

eliminated as part of a mini-reduction in force ('mini-RIF'), the fourth element of the prima facie case becomes whether the employee's duties were absorbed by workers outside [his] protected class." *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759–60 (2022).

If an employee establishes a prima facie case of employment discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Lewis*, 36 F.4th at 760. The burden then shifts back to the employee to show why the employer's explanation is pretextual. *Id.*

At summary judgment, the question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Courts must assess the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Tyburski*, 964 F.3d at 598.

### 5.2. Ascension's Articulated Reasons for Terminating Dr. Battista

For purposes of summary judgment, Ascension concedes that Dr. Battista can establish a prima facie case of age discrimination. (ECF No. 24 at 5.) However, Ascension asserts that it had a legitimate, non-discriminatory reason for terminating Dr. Battista. (*Id*.) To meet its burden, Ascension "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been

motivated by discriminatory animus." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981).

Ascension argues that Dr. Battista was terminated in accordance with its economic recovery plan. (ECF No. 24 at 5–8.) It is undisputed that Ascension developed this plan to help it address the ongoing financial impact of the COVID-19 pandemic. (ECF No. 25, ¶¶ 48–49.) Ascension provides admissible evidence showing that, in forming its plan, it assessed each hospital's unique situation and needs, considered whether each hospital could sustain the current number of surgeons on staff, evaluated each surgeon's annualized wRVUs, reviewed retirement plans, and assessed staffing changes to reduce costs. (*Id.*, ¶ 55; *see also* ECF No. 26-1.)

The record supports the contention that Ascension determined that St. Joseph's Hospital could support only three surgeons and, since it had already hired Dr. Goelz, Ascension included him in its analysis of how to reduce the number of surgeons at St. Joseph's Hospital to three. (ECF No. 25, ¶¶ 63, 65.) The evidence also shows that, among the three surgeons then currently working at St. Joseph's Hospital, Dr. Battista had the lowest annualized wRVUs and took the least amount of call. (*Id.*, ¶¶ 66, 70.) Ascension also projected that Dr. Goelz's wRVUs in the first year of his employment would be slightly higher than Dr. Battista's annualized wRVUs and that he would work call more often than Dr. Battista. (*Id.*, ¶¶ 69, 74.)

Because Ascension believed Dr. Battista might retire soon after Dr. Goelz started, it asked Dr. Battista about his retirement plans before terminating his employment. (ECF No. 25, ¶ 75.) Meeting notes from May 23, 2022, support this, stating: "If Battista does not retire consider him for separation or offer accelerated retirement as he is not overly productive and does not take much call." (ECF No. 26-1 at 4.) When Dr. Battista informed Ascension that he did not plan to retire, Ascension terminated his employment. (ECF No. 25, ¶ 84.)

Ascension's explanation for terminating Dr. Battista is "clear and reasonably specific." *See Tex. Dep't of Cmty. Affairs*, 450 U.S. at 258. As part of its economic recovery plan, Ascension reviewed patient volumes at its hospitals, reassessed the number of surgeons it needed, compared surgeons' annualized wRVUs, and used this information to decide who would be terminated. (ECF No. 25, ¶¶ 48–55.)

Thus, Ascension has met its burden of producing admissible evidence of a legitimate, nondiscriminatory reason for terminating Dr. Battista–that St. Joseph's Hospital could only retain three surgeons, and he had the lowest predicted productivity. *See Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) (finding that an employer meets its burden of proof when it produces admissible evidence of a legitimate, nondiscriminatory reason for the adverse employment action).

### 5.3. Pretext

Once an employer offers a legitimate, nondiscriminatory reason for discharging an employee, the burden shifts back to the employee to show that the employer's proffered reasons are pretext for discrimination. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir. 1994). "Pretext may be proven 'directly with evidence that an employer was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible.'" *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 574 (7th Cir. 2003) (quoting *Wade v. Lerner*, N.Y., Inc., 243 F.3d 319, 323 (7th Cir. 2001)). At the summary judgment stage, the employee does not need to prove the employer's non-discriminatory reasons are pretextual; instead, he must only "'produce evidence from which a rational factfinder could infer that the company lied' about its proffered reasons for his dismissal." *Anderson*, 13 F.3d at 1124 (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir. 1990).

Ascension claims it terminated Dr. Battista because he had the lowest annualized wRVUs among the surgeons at St. Joseph's Hospital and lower wRVUs than Dr. Goelz's predicted wRVUs. (ECF No. 24 at 6.) Dr. Battista's annualized wRVUs were 3,104, and Dr. Goelz's predicted wRVUs were 3,191. (ECF No. 25, ¶ 66; ECF No. 28-1 at 2.) It is unclear how Ascension determined Dr. Goelz's projected annual wRVUs, as he was not working at St. Joseph's Hospital during the March–May 2022 base period, unlike Drs. Battista, Nelson, and Berg.

Dr. Battista explains that his annualized wRVUs were lower than Drs. Nelson and Berg because Ascension had asked him to help rebuild the surgical practice at its Weston Hospital. (ECF No. 31, ¶ 66.) He agreed, and spent one to two weeks per month at Weston, also recruiting other surgeons there. (*Id.*, ¶¶ 66–67.) During this time, Dr. Berg took over Dr. Battista's work at St. Joseph's Hospital, causing Dr. Battista's wRVUs at St. Joseph's to decrease by twenty-five percent. (*Id.*, ¶ 69.) Prior to his assignment at Weston, Dr. Battista averaged between 4,000 and 6,000 wRVUs annually. (*Id.*, ¶ 70.)

Ascension further claims that it terminated Dr. Battista because Dr. Goelz planned to take more call hours than he did. (ECF No. 24 at 6.) However, Dr. Battista always fulfilled his contracted call hours and Ascension never requested that he increase them. (ECF No. 31, ¶¶ 34, 42.) In fact, when Dr. Battista volunteered to take on more call hours in 2022, he was told not to worry about it and that, due to his age and seniority, he deserved to work less call. (ECF No. 26-3 at 132:17–22.)

Additionally, Ascension never expressed concerns about Dr. Battista's wRVUs or call hours before his termination. (ECF No. 31, ¶ 42.) He was never told, either orally or in writing, to increase his wRVUs or call hours, nor was he informed that his job depended on doing so. (*Id.*) Ascension terminated Dr. Battista immediately after he informed Ascension he was not retiring, without giving him an option to reduce his hours like it did with Dr. Wu at Elmbrook Hospital. (*Id.*, ¶¶ 47, 55.) When Dr. Battista asked for

a reason for his termination, he was simply told, "it had been decided", with no further explanation. (*Id.*, ¶ 54.)

"[T]here is a fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment." *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir. 1994). The issue of pretext "does not address the correctness or desirability of reasons offered from employment decisions. Rather it addresses the issue of whether the employer honestly believes in the reasons it offers." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992); *see also Testerman*, 98 F.3d at 304 (explaining that, "when age enters into the calculus to such an extent that the employer fires an employee who otherwise would have survived the RIF, the ADEA has been violated").

Dr. Battista has gone beyond simply disagreeing with Ascension's stated reasons for his termination. He has cited specific facts that suggest Ascension's after-the-fact explanation for his termination may not reflect its true motivation. *See Shager*, 913 F.2d at 401 (holding that, "if the inference of improper motive can be drawn, there must be a trial"). He presents evidence that Ascension never raised concerns about his wRVUs or call hours before he was terminated. (ECF No. 31, ¶¶ 42, 50, 53.) *See Kralman*, 23 F.3d at 156 (explaining that pretext can be shown with evidence that the employer's stated reason is "unworthy of belief—a mere pretext, possibly of discrimination").

At this stage, the relevant question is not whether Ascension's stated reasons for terminating Dr. Battista are correct, but whether they are the true reasons for its action, rather than pretext for age discrimination. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006). Because Dr. Battista has presented evidence from which a rational factfinder could infer that Ascension lied about its reasons for terminating him, summary judgment is not warranted. *See id.* at 417 (explaining that summary judgment is inappropriate if a "trier of fact (judge or jury) would be entitled to infer a discriminatory motive from the pretextual character of the employer's ground").

## 6. Conclusion

**IT IS THEREFORE ORDERED** that Ascension Medical Group – Southeast Wisconsin Inc.'s, motion for summary judgment (ECF No. 23) is **DENIED.** The clerk of courts shall schedule a status conference to discuss how the case will proceed.

Dated at Milwaukee, Wisconsin this 23rd day of March, 2026.

WILLIAM E. DUFFIN
U.S. Magistrate Judge